Marc P. Berger, Esq.
Lara Shalov Mehraban, Esq.
Thomas P. Smith, Jr., Esq.
Kevin P. McGrath, Esq.
John Lehmann, Esq.
Nathaniel I. Kolodny, Esq.
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0533 (McGrath)
E-mail: McGrathK@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDER C. BURNS and ANDREW B. SCHERR, <br><br> Defendants. | ECF CASE <br><br><br> COMPLAINT AND JURY DEMAND |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Alexander C. Burns and Andrew B. Scherr (collectively "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      From March 2013 to February 2014 (the "Relevant Period"), Burns, with the substantial assistance of Scherr, perpetrated multiple schemes to defraud their advisory clients, which were insurance companies and reinsurance trusts. As part of their schemes, Defendants acquired control over the investment funds of five insurance companies and seven reinsurance trusts. Defendants then fraudulently caused these entities to transfer over $300 million in cash to companies controlled by Defendants in exchange for essentially worthless or grossly overvalued

securities created by or at the direction of the Defendants.  Defendants fraudulently diverted millions of dollars for their own use, and for their companies' use, and their actions resulted in at least five insurance companies having insufficient assets to pay their policy holders' claims and being placed into receivership after the scheme imploded.

2.        Defendants used two investment entities to perpetrate their schemes.  Burns was the majority owner and control person of Southport Lane Management, LLC ("SLM"), a private equity firm based in Manhattan, N.Y. and Southport Lane Advisors, LLC ("SLA"), a registered investment adviser and wholly owned subsidiary of SLM with offices in Manhattan, N.Y. and Seattle, Washington.  For most of the Relevant Period, Scherr was a minority owner of SLM and SLA.  In February 2014, Scherr became the majority owner of SLM and SLA when Burns divested himself of his interests in SLM and SLA.

3.        The schemes involved three phases.  First, SLM acquired majority interests in five insurance companies and acquired control of the funds in seven separate reinsurance trusts with which those five insurance companies had reinsurance relationships.  SLM acquired the controlling interests in a number of these insurance companies by either selling them asset-backed securities of questionable, if any, value, or by surreptitiously using the funds controlled by one insurance company to acquire controlling interests in another insurance company.

4.        Second, Burns and SLM directed the insurance companies and reinsurance trusts that SLM now controlled to enter into investment management agreements ("IMAs") with SLA.  The IMAs allowed SLA to make investment decisions for, and gain control over, the capital reserve assets of these insurance companies and reinsurance trusts (collectively, the "Advisory Clients").

5.        Third, Burns, with the assistance of Scherr, raided those insurance companies of their funds through a variety of fraudulent transactions and misrepresentations and omissions of material fact.  Scherr assisted Burns, in part, by using entities he was affiliated with to acquire assets that

were either worthless or greatly overvalued.  Burns, through SLM, then transferred the assets

provided by Scherr and others into a series of asset-backed securities and unit investment trusts

("UITs") (collectively the "Southport Securities").  Burns, through an SLM affiliate, Administrative

Agency Services, Inc. ("AAS), then created grossly overstated valuations for the Southport

Securities and, through SLA, caused these overvalued, illiquid securities to be sold to the Advisory

Clients.

      6.     SLA failed to disclose to the Advisory Clients that the Southport Securities were

created by, and originally owned by SLM, or its affiliates, and that the assets were valued by an

SLM affiliate, AAS.  These undisclosed, related party transactions, often involving fraudulently

overvalued or essentially worthless, illiquid securities, were in direct contravention of the terms of

SLA's IMAs with the Advisory Clients, were in breach of SLA's fiduciary duties to its Advisory

Clients and were otherwise in violation of the securities laws.

      7.     For example, in one scheme, Scherr caused a company with which he was affiliated

to purchase an interest in a painting of questionable authenticity for approximately $15 million; his

affiliated company then sold its interest in the painting to a SLM affiliate for $40 million.  Burns,

through AAS, then transferred the SLM affiliate's interest in the painting into the UITs, and valued

the interest in the painting at $128 million.  Burns, through SLA, then sold these overvalued UITs to

SLA's Advisory Clients, thereby fraudulently obtaining approximately $175 million from SLA's

Advisory Clients.

      8.     In another scheme, Scherr helped create a company for the purpose of acquiring what

he claimed was $100 million worth of stock in a private fiber optic company in exchange for $80

million in promissory notes.  The owner of the fiber optic company considered the company to be

worth no more than $10 million.  Scherr and Burns, through a SLM affiliate, acquired Scherr's

company's interest in the private company for $80 million in promissory notes.  Burns, retaining the

unsupportable value of $100 million for SLM's interest in the private company, contributed that interest into a fourth and fifth series of UITs.  Burns, through SLA, also sold these overvalued UITs to SLA's Advisory Clients, thereby fraudulently obtaining approximately $112 million from SLA's Advisory Clients.

9.      In a third, related scheme, Burns breached his fiduciary duties to SLA's Advisory Clients by recommending, through SLA, that they purchase Southport Securities.  The Southport Securities were not suitable investments for SLA's Advisory Clients because they were not eligible assets as defined by each Advisory Client's state insurance regulator, and caused more than $50 million in additional losses to the Advisory Clients.

10.      Through the conduct described above, Burns and Scherr fraudulently diverted more than $300 million of SLA's Advisory Client's funds.  Additionally, SLM and SLA collected over $8 million in investment management and advisory fees from the Advisory Clients.  These fees were based typically on 1.5% of the inflated asset values in the Advisory Clients' accounts.  Burns used the proceeds of the fraudulent securities transactions to make payroll, transfer large sums of money to himself and Scherr, and to acquire new investment opportunities to continue to grow SLM's business.

11.      Burns and Scherr personally profited from these schemes in a variety of ways, including paying themselves annual salaries ranging from $460,000 to $600,000 using money SLM obtained directly or indirectly from the Advisory Clients.  During the Relevant Period, Burns also moved more than $35 million of Advisory Clients' funds through his personal bank accounts, of which he retained approximately $915,000 (including salary) and transferred the remainder to SLM.  Between 2013 and 2016, Scherr obtained approximately $1.4 million (including salary) from the scheme.

## VIOLATIONS

12.     By engaging in the conduct set forth in this Complaint, Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

        a.     Burns violated Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), 206(2), and 206(3) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)];

        b.     Burns aided and abetted violations of Section 17(a)(2) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder; and Sections 206(1), 206(2), and 206(3) of the Advisers Act; and

        c.     Scherr aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 15(b), 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77o(b), 77t(b), 77t(d), and 77v(a)], Sections 20(e), 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78t(e), 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e), 209(f) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b- 9(e), 80b-9(f) and 80b-14].

14.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain transactions, acts, practices, and courses of

business constituting the violations alleged herein occurred within the Southern District of New York. For instance, during the Relevant Period, Defendants, acting from their Manhattan office, sent materially false and misleading statements via email and made materially false and misleading statements by telephone to Advisory Clients and others and misappropriated funds from an insurance company based in Manhattan.

15.     Defendants, directly or indirectly, used means or instrumentalities of interstate commerce and of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

## RELIEF SOUGHT

16.     The Commission seeks a permanent injunction and disgorgement against both Defendants pursuant to Section 20(b) of the Securities Act, Section 21(d) of the Exchange Act, and Section 209(d) of the Advisers Act [15 U.S.C. §§ 77t(b), 78u(d), and 80b-9(d), respectively]. The Commission seeks civil monetary penalties against both Defendants pursuant to Section 20(d) of the Securities Act, Section 21(d) of the Exchange Act, and Section 209(e) of the Advisers Act [15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(e), respectively].

## DEFENDANTS

17.     **Burns**, 31, is a resident of Charleston, South Carolina. During the Relevant Period, Burns resided in New York City. Burns incorporated SLM in July 2011 and became its sole Managing Member. During the Relevant Period, Burns indirectly owned the majority of SLM through an entity called Heartland Family Group, LLC ("Heartland"). Burns was SLM's "Chief Strategy Officer" and the ultimate control person at SLM. Burns formed SLA in February 2012. Burns controlled SLA through his ownership of SLM. He also provided trading instructions to SLA and had trading authority over various SLA-advised accounts.

18.     **Scherr**, 50, is a resident of Livingston, New Jersey. Scherr is an attorney licensed to

practice in Maryland, although his license has been suspended since 2006 for administrative reasons. Prior to 2010, Scherr worked at several registered broker-dealers. During the Relevant Period, Scherr indirectly owned approximately 15% of SLM through an entity called Avery Ellis, LLC.

## OTHER RELEVANT ENTITIES

19.     **SLM** was a Delaware limited liability company whose principal place of business was in New York, N.Y.  SLM was a private equity firm that in 2012 began to acquire interests in insurance companies to gain control over the insurance companies' assets held in trust. SLM directly owned or served as the general partner of approximately 20 separate entities, which, unless specifically identified, are collectively referred to as SLM. SLM ceased operations in June 2016.

20.     **SLA** was a Delaware limited liability company whose principal place of business was in Seattle, Washington.  In February 2013, SLA registered with the Commission as an investment advisor to four insurance company clients, claiming $390 million regulatory assets under management ("AUM").  In March 2014, SLA filed a Form ADV with the Commission, in which it stated that it was no longer eligible to remain registered with the Commission and that it had no clients and no AUM. SLA was wholly owned by SLM, and listed SLM's New York City address as an SLA office address. SLA's Advisory Clients were either insurance companies or reinsurance trusts that SLM either owned or indirectly controlled.

21.     The **Beaconsfield Trusts** refers to four trusts created in March 2013, when Beaconsfield Sponsor LLC, an SLM subsidiary, entered into four preliminary trust agreements with a third party bank acting as trustee. On May 3, 2013, the four Beaconsfield Trusts were amended and gained the ability to issue indentures and securities. Sometime after May 3, 2013, SLM authorized the Beaconsfield trustee to issue securities (the "Beaconsfield Securities"). The Beaconsfield Securities were asset-backed securities purportedly collateralized by $50 million worth

of participating debt certificates issued by offshore entities.

22.     **Southport Specialty Finance ("SSF")** was a Delaware limited liability company with its principal place of business in New York, N.Y.  During the Relevant Period, SSF was wholly owned by SLM and controlled by Burns.  Burns used SSF to acquire assets that were subsequently overvalued, securitized and sold to SLA's Advisory Clients.

23.     **AAS** was a Delaware limited liability company with its principal place of business in New York, N.Y.  During the Relevant Period, AAS was wholly owned by SLM and controlled by Burns.  AAS served as the administrator of several UITs that SLM initiated as well as for the Beaconsfield Securities.  AAS was also the managing member of several limited liability companies created by SLM, whose security interests were sold by SLA to its Advisory Clients.  AAS had control over the valuation process for the assets held in the trusts that it administered.  Burns actively concealed from the Advisory Clients that AAS was affiliated with and had the same owners as SLA and SLM.

## FACTS

I.     <u>**SLM and Burns Acquire Insurance Companies and Reinsurance Trusts**</u>

     A.     **SLM Acquires Freestone Insurance Company (f/k/a Dallas National Insurance Company) and Freestone's Relationships with Companion and Accident**

24.     On March 12, 2013, at Burns's direction, a subsidiary of SLM, Lonestar Holdco ("Lonestar"), acquired a controlling interest in the Dallas National Insurance Company ("DNIC").  The terms of the agreement required SLM to pay $50 million in "cash and securities qualifying as admitted assets and having a readily determinable market value."

25.     Through a series of fraudulent paper transactions orchestrated by Burns and facilitated by a broker-dealer, Lonestar acquired a controlling interest in DNIC for a purported $50 million purchase price and, at Burns's direction, DNIC purchased what purported to be $50 million

worth of Beaconsfield Securities. No cash was exchanged in either of these transactions. Burns actively misled members of DNIC's senior management and others to believe that as of March 12, 2013, the Beaconsfield Securities were: (i) valid, transferable securities; (ii) worth $50 million; and (iii) "admissible assets" as required by DNIC's state insurance regulators. In fact, each of the foregoing representations was either materially misleading or false, which Burns either knew or should have known.

26.     Specifically, the Beaconsfield Securities were not fully formed as of March 12, 2013. The Beaconsfield Trusts were only recently formed as of that date and possessed no assets. The four March 8, 2013 Beaconsfield Trust formation agreements each explicitly provided that the parties (SLM and the third-party trustee (the "Bank Holding Company")) would enter into an amended and restated trust agreement "to provide for the contemplated operation of the Trust created hereby and the issuance of certain notes by the Trust."

27.     Moreover, as of March 12, 2013, each of the four Beaconsfield Securities had a notional value of only $1. And despite their purporting to be asset-backed securities, there were no assets yet underlying the Beaconsfield Securities.

28.     On or before March 12, 2013, Burns drafted and caused to be sent to DNIC a letter falsely stating that the Beaconsfield Securities were suitable under the Delaware Insurance Code for capital reserve assets. Because of the importance of having funds available to pay claims, state insurance laws, including Delaware's, generally require insurance companies to invest in stable, low-risk, liquid securities such as United States treasury notes and mutual funds. Burns knew the Beaconsfield Securities did not meet Delaware's requirements for suitability for capital reserve assets.

29.     In addition, the letter stated that the Beaconsfield Securities were "adequately secured by collateral security ... as of the date of the acquisition ... with a market value in excess of

100% of the value of the tangible assets." Burns knew this statement was false because there were no assets underlying the Beaconsfield Securities in March 2013.

30.     In furtherance of his fraudulent scheme, Burns arranged to pay a third-party broker-dealer $15,000 to provide deceptive stock confirmations in connection with Lonestar's purchase of its controlling interest in DNIC and DNIC's purchase of the purported $50 million worth Beaconsfield securities.

31.     After SLM's purchase of DNIC on March 12, 2013, Burns worked to retroactively create and fund the Beaconsfield Securities he had caused DNIC to purchase.

32.     On or about May 3, 2013, SLM and the trustee entered into four Amended and Restated Trust Agreement and Indenture Agreements, which permitted the four Beaconsfield Trusts to issue indentures and securities. However, the parties to these agreements entered into a separate Agreement to Amend Closing Date which amended the dates of these transactional documents to May 23, 2013 and set the closing date for issuance of the indentures to that date. Thus, the Beaconsfield Securities did not legally exist and could not have been sold legally to Freestone prior to May 23, 2013.

33.     On or about May 5, 2013, Burns signed a backdated assignment of securities document that assigned what purported to be $50 million worth of participating debt certificates as collateral for the four Beaconsfield Securities.

34.     Not until approximately June 2013 did SLM authorize the Bank Holding Company to issue the Beaconsfield Securities. Thus, the Beaconsfield Securities, even if fully-secured, could not have been issued and sold by the Beaconsfield Trusts until June 2013, well after their purported sale to DNIC on March 12, 2013.

35.     Sometime on or around March 12, 2013, SLM re-domiciled DNIC to Delaware, and renamed it the Freestone Insurance Company ("Freestone"). Freestone continued to have its

primary place of business in Dallas, Texas.

36.     Shortly thereafter, Freestone's senior management, along with the former owner of

DNIC (who retained an interest in Freestone), began expressing concerns regarding the

Beaconsfield Securities.  They began pushing Burns to provide Freestone with replacement assets.

As a result, in October 2013, Burns took funds from trust accounts of another insurance company

SLM controlled and gave them to DNIC in exchange for the Beaconsfield Securities, which Burns

retired from circulation.

37.     As a result of the Freestone acquisition, SLM gained control of the insurance

premium funds that Freestone managed.

38.     Additionally, SLM gained access to funds Freestone held in trust for a Blue Cross

Blue Shield subsidiary called Companion Property and Casualty of South Carolina ("Companion"),

based in Columbia, South Carolina.  Freestone had a "fronting" arrangement with Companion,

pursuant to which Freestone wrote insurance policies in Companion's name, paid Companion a fee,

and retained the remainder of the premiums, but was required to establish a trust account to satisfy

any claims resulting from those policies.

39.     Freestone also had a reinsurance relationship with Accident Insurance Company

("Accident"), another South Carolina insurance company.  SLM acquired the reinsurance

relationship with Accident as part of the Freestone acquisition.

**B.     SLM Acquires Redwood and its Relationship with Companion**

40.     As part of the Freestone transaction, SLM also acquired Redwood Reinsurance SPC,

Ltd. ("Redwood"), a Cayman Islands-based reinsurance company that had been owned by

Freestone.  Redwood also had a reinsurance relationship with Companion, and SLM's acquisition of

Redwood provided SLM with access to funds Redwood held in trust for Companion.

C.       **SLM Acquires Imperial and National Automotive Insurance Companies**

41.      In May 2013, at Burns's direction, SLM used SLA's managed capital reserve funds from Freestone and Companion to indirectly acquire Imperial Fire & Casualty ("Imperial") an insurance company based in Opelousas, Louisiana, via a SLM-affiliated investment trust.  SLM thereby gained control of insurance premium funds that Imperial managed.

42.      Also as part of its acquisition of Imperial, in December 2013, SLM acquired another Louisiana-based insurance company, National Automotive Insurance Company ("National Automotive").  SLM thereby gained control of insurance premium funds that National Automotive managed.

D.       **SLM Establishes SPRC, Through Which It Provides Reinsurance to Tower, SCOR, Commonwealth, Partner Re, and White Rock**

43.      SLM established Southport Re (Cayman) Ltd. ("SPRC"), a Cayman Islands-based reinsurance company, in July 2012.  SLM, through SPRC, entered into reinsurance trust agreements with five insurance companies.

44.      SPRC entered into a reinsurance trust agreement with SCOR Global P&C SE ("SCOR"), a French company, in June 2013.  SPRC entered into a reinsurance trust agreement with Commonwealth Casualty Company of Arizona ("Commonwealth") in July 2013.  SPRC entered into two reinsurance trust agreements with Tower Insurance Company of New York ("Tower") in September 2013.  SPRC entered into a reinsurance trust agreement with Partner Reinsurance Europe SE ("Partner Re") (an Irish company) in October 2013.  SPRC entered into a reinsurance trust agreement with White Rock Ins. (SAC) T28 ("White Rock") (a Bermuda company) in January 2014.

45.      SPRC's reinsurance relationships gave SLM control over funds SPRC held in trust for SCOR, Commonwealth, Tower, Partner Re, and White Rock.

II.     **SLM and Burns Used SLA as the Investment Adviser to Manage the Advisory Clients' Funds**

46.     Each of the insurance companies and reinsurance trusts over which SLM now had control were required to invest its funds consistent with its respective state's insurance laws, which meant that the securities needed to be invested in stable, low-risk securities.

47.     In early 2012, Burns established SLA as a wholly-owned subsidiary of SLM.  Burns directed the insurance companies and reinsurance trusts SLM controlled to use SLA as their investment adviser.

48.     Specifically, Burns directed SLM's general counsel to draft an IMA between each insurance company and SLA to govern the terms of the advisory relationship, including portfolio holding parameters, valuation, and advisory fees, and each of the Advisory Clients entered into an IMA with SLA.  The IMAs for U.S.-based Advisory Clients were reviewed and approved by the pertinent state insurance regulators.

49.     None of the IMAs disclosed that SLA would recommend that the Advisory Clients' funds be primarily invested, via related party transactions, in securities issued by SLM affiliates, and in many instances through principal transactions in which SLM owned the securities that SLA recommended be purchased by the Advisory Clients.  The IMAs also did not disclose that the recommended securities were valued by AAS, another SLM affiliate – creating a clear conflict of interest that was not otherwise disclosed by SLA.

50.     In February 2013, SLA registered with the Commission as an investment adviser by filing its Form ADV ("Initial Form ADV").  SLA's Initial Form ADV stated that SLA had four investment adviser clients, claimed to have $390 million in regulatory AUM and stated that SLA "does not recommend that clients buy or sell any security in which a related person to [SLA] or [SLA] has a material financial interest."

51.     Burns drafted and/or reviewed every disclosure in SLA's Initial Form ADV, and he

13

knew, or was reckless in not knowing, that the Initial Form ADV misrepresented the manner in which SLA handled its Advisory Clients' funds.

52.     In January 2013, SLA entered into an IMA with Redwood. SLA's IMA with Redwood gave it full discretionary trading authority over the reinsurance accounts that Redwood managed for Companion, provided that the investments complied with both Redwood's and Companion's investment policies and South Carolina insurance statutes. For example, Redwood's "Statement of Investment Objectives and Policies" defined allowable assets to include asset backed notes and mutual funds whose assets are comprised of government or publicly-issued securities.

53.     Also in January 2013, SLM entered into an Amended and Restated Advisory Services Agreement ("ASA") with Redwood, which was signed by Burns on behalf of SLM. Pursuant to that agreement, SLM agreed to assist in "sourcing assets and to provide advice upon the investments in accordance with" Redwood's policies and restrictions.

54.     SLA's IMA with Redwood entitled SLA to annual advisory fees of 1.5% of the AUM and SLM's ASA with Redwood entitled it to an annual "Advisory Services Fee" of 2% of the increase of the Redwood trust's Net Asset Value ("NAV").

55.     SLM also directed Freestone to become an Advisory Client of SLA, and in July 2013, SLA and Freestone signed an IMA. The Freestone IMA gave SLA the right to direct all of Freestone's investment activity, without first consulting Freestone, with the proviso that SLA would comply with Freestone's investment guidelines and Delaware insurance statutes. The Freestone IMA entitled SLA to an advisory fee of 1.5% of AUM.

56.     Freestone's investment guidelines, like the guidelines issued by SLA's other Advisory Clients, set forth general risk avoidance principles and provided specific guidance on acceptable investments. For example, Freestone required its money to be invested almost exclusively in liquid securities, stating that its portfolio "shall have a sufficiently conservative view

of illiquid securities …. The Fund should have sufficient liquidity to meet operations of the Company at all times." Its guidelines also prohibited, among other investments, investing: (i) more than 10% with any one issuer; (ii) more than 10% in any below-investment-grade issuer or an unrated issuer that SLA "believes would not reasonably be rated investment grade if rated." In addition, Delaware insurance law capped the amount of money an insurer could invest in related party transactions at 3%.

57.     SLM also directed Imperial to become an Advisory Client of SLA and, in October 2013, SLA and Imperial signed an IMA. The Imperial IMA required SLA to manage the account in accordance with Louisiana insurance laws and Imperial's own investment policy statement, which contained conservative investment requirements almost identical to SLA's IMAs with Freestone and Redwood. The Louisiana Department of Insurance also required SLA to reduce its advisory fee from 1.5% to .5% of AUM.

58.     SLA and National Automotive entered into an IMA in December 2013. This IMA had the same relevant terms as the Imperial IMA with respect to conservative investment requirements.

59.     In October 2013, SLA entered into an IMA with SPRC. SLA's IMA with SPRC gave SLA complete control over SPRC's accounts, so long as SLA only recommended investments that complied with Delaware insurance laws and SPRC's own investment policy. Pursuant to its IMA with SPRC, SLA acted as an investment advisor to reinsurance trust accounts SPRC managed for Tower, SCOR Global, Commonwealth, Partner Re, and White Rock.

III.     <u>SLA's Investment Recommendations Breached the Fiduciary Duties SLA and Burns
         Owed to the Advisory Clients and Violated the IMAs' Investment Parameters</u>

    A.     **Burns, Aided and Abetted by Scherr, Created SLM-Owned and Managed
           Unit Investment Trusts, Which Were Mischaracterized as Suitable and
           Eligible Investments to SLA's Advisory Clients**

         1.   **The Formation of the UITs**

60.     From June 2013 to January 2014, SLA caused approximately $250 million of its

Advisory Clients' funds to be used to purchase units in five UITs that SLM created.

61.     The UITs' deal documents identified AAS as the entity that would serve as the

administrative agent to each UIT and that had responsibility for valuing the assets underlying the

UITs.  However, nowhere in the UIT deal documents was it disclosed that AAS was a wholly-

owned subsidiary of SLM.

62.     SLM, at Burn's direction, actively concealed from the Advisory Clients the

relationship between SLM and AAS.  Burns, in his capacity as the managing member of SLM,

designated three SLM employees to be the signatories for AAS.  Of the three designated signatories,

Burns directed that one junior employee be the primary signatory for all AAS-related documents.

Because the AAS signatories did not sign documents on behalf of other SLM-affiliated entities,

potential investors were misled into believing that AAS and SLM were separate entities engaged in

arms-length transactions.  In truth, SLM served as the UITs' *de facto* administrative agent through

its hidden ownership and control over AAS, the purported administrative agent.

63.     Burns directed Scherr to find assets that they would then overvalue, deposit into the

UITs and sell to the Advisory Clients in the form of securitized UIT units.

64.     Burns and SLM, with the assistance of Scherr, used the UITs as a means of

collateralizing assets that Burns and Scherr knew or should have known were not only fraudulently

overvalued, but also ineligible investments for insurance companies pursuant to the Advisory

Clients' IMAs and state insurance laws.  By repackaging these assets into UITs, which Burns, SLM

and SLA falsely told their Advisory Clients were akin to mutual funds, Burns, SLM and SLA, with the assistance of Scherr, were able to sell their Advisory Clients oftentimes highly illiquid, ineligible assets that violated the terms of the IMAs and state insurance laws.

65.     Specifically, at Burns's direction, each of the first three series of the UITs had as its primary portfolio security holding an interest in a correspondingly named limited liability company: TIO Series I, LLC; TIO Series II, LLC; and TIO Series III, LLC (collectively "TIOs I-III").  TIOs I-III in turn primarily owned interests in non-cash generating, illiquid assets chosen and/or created by Scherr and Burns, and valued by Burns, acting through AAS.  Burns purposefully created this structure to conceal from the Advisory Clients who acquired interests in the UITs, and their respective state regulators, that the UITs' holdings were in fact illiquid and of questionable value.

### 2.  The Purported Caravaggio Fraudulent Scheme

66.     The single largest asset held by each of the first three series of UITs was an interest in a painting purportedly by the Renaissance painter Caravaggio but of questionable authenticity (the "Purported Caravaggio").

67.     To assist Burns in perpetrating the fraud, Scherr and a partner, using a company with which they were affiliated, Green Moss Partners, LLC ("Green Moss"), purchased the rights to the Purported Caravaggio.

68.     Specifically, in October 2012, Scherr caused Green Moss to enter into an agreement whereby it purchased the Purported Caravaggio from a Florida trust (the "Florida Trust") for $15,790,000, consisting of a $710,000 down payment and a purchase money promissory note and mortgage in the amount of $15,080,000.  The Florida Trust retained physical control of the Purported Caravaggio, which served as collateral for the $15,080,000 note, and also received an option to repurchase the painting for $37 million in 2014; $42 million in 2015 and $47 million in 2016.

69.     Thus, Green Moss did not obtain complete ownership and control over the Purported Caravaggio when it purchased it in October 2012.

70.     On the same day that Scherr, on behalf of Green Moss, purchased the Purported Caravaggio for $15,790,000, Scherr's associate in Green Moss entered into an agreement to sell the Purported Caravaggio to Burns, acting on behalf of SSF, for $40,000,000, consisting of a $1,500,000 down payment and a purchase money promissory note in the amount of $38,500,000. Green Moss also obtained an option through October 2016 to repurchase the painting from SSF for $38,500,000 million.  Thus, SSF's interest in the Purported Caravaggio was also limited due to these repurchase options.

71.     Green Moss falsely represented and warranted to SSF that it "has previously extensively researched and been advised regarding the Purported Caravaggio by its own experts and advisers."  In truth, Green Moss did no extensive research or due diligence and did not engage its own experts and advisers to research the authenticity of the Purported Caravaggio.

72.     For example, even minimal due diligence would have discovered that the Purported Caravaggio had been the subject of extensive litigation involving the Florida Trust and third parties prior to 2012 which raised serious questions regarding the Purported Caravaggio's authenticity.  A court-appointed appraiser in that litigation had concluded that the painting "is not an authentic Caravaggio."  Another court-appointed appraiser in that litigation concluded that the Purported Caravaggio had a fair market value of $25,000 and that "most of the experts concur that it is a copy painted relatively contemporaneously to the Prado work" (referring to a version of the painting in the Prado Museum in Madrid, Spain).  The Court also noted that three reputable art auction houses had declined to authenticate and sell the Purported Caravaggio.

73.     In addition, in April 2012, a SLA employee emailed Scherr that there were three other copies of the Purported Caravaggio; one in the Villa Borghese in Rome, Italy, a second in the

Museum of Art History in Vienna, Austria, and a third in the Prado Museum in Madrid, Spain, adding "at least we now know there is more than one."

74.     Thus, no later than April 2012 Scherr was on notice of serious concerns regarding the Purported Caravaggio's authenticity and no later than October 2012 Scherr knew, or was reckless in not knowing, that there were serious questions regarding the Purported Caravaggio's authenticity, value and marketability.

75.     AAS valued the Purported Caravaggio at $128,000,000.  Burns caused SSF to transfer its interest in the Purported Caravaggio, which it valued as a capital contribution of $128,000,000, to an SLM–affiliated entity, TIO Art Funding LLC ("TIO Art") in return for 128,000 units of TIO Art.

76.     Pursuant to SLM's and Burns's direction, SSF then transferred 42,700 units each of TIO Art to TIOs I-III, and caused interests in these TIO Series I-III to be transferred to the first three UITs (Series I-III), respectively to serve as their primary asset.  Interests in the UIT were then sold to the Advisory Clients as discussed below.

77.     Burns and Scherr knew, or were reckless in not knowing, that AAS's $128 million valuation of the Purported Caravaggio, which constituted an 8-fold increase in value as compared to the original Green Moss purchase price and a 3-fold increase in value as compared to SLM's purchased price from Green Moss, had no reasonable basis in fact.

78.     Indeed, given that the Florida Trust retained its rights, throughout all of the above-described transactions, to repurchase the Purported Caravaggio from Green Moss for, at most, $47 million (which it would logically exercise if the painting's actual value exceeded that price), and that an option exercise by the Florida Trust would trigger Green Moss's exercise of its option to repurchase the Purported Caravaggio from SSF for $38.5 million, the value of the Purported Caravaggio to SLM, SSF, TIO ART, and the UITs, could not exceed $38.5 million during the

Relevant Period, regardless of the painting's true assessed value.

79.     Moreover, Green Moss never consummated its purchase of the Purported Caravaggio; it failed to make all of the required payments to the Florida Trust, which retained physical control of the painting at all relevant times.  SSF also failed to comply with its guarantee of Green Moss's obligation to the Florida Trust.

### 3. Burns, Aided and Abetted by Scherr, Used the UITs to Misappropriate Millions of Advisory Clients' Funds

80.     Series I-III of the UITs came into existence on October 1, 2012, each with a purported value of $65 million ($195 million total).  At Burns's direction, SLM sold $30 million of units in the UITs ($10 million of each series) for cash to Freestone (then known as DNIC) on October 1, 2012.

81.     This was before the Purported Caravaggio, the largest purported asset in the Series I-III UITs, had even been sold by the Florida Trust to Green Moss and subsequently acquired by the UITs.  Thus, not only was the Purported Caravaggio's value overstated, but the UITs did not even own interests in it at the time these UITs units were sold to Freestone.

82.     On or about June 28, 2013, Burns directed the transfer of 17,684 units of UIT Series I-III, valued at $18 million, into Imperial's custody account.  SLM did so as part of its deal to acquire Imperial, which required it to infuse $18 million worth of assets into Imperial.

83.     On or about August 6, 2013, at SLA's recommendation, Companion paid $25,449,898.63 in cash to a SLM affiliate for 24,999 units of UIT Series I-III.

84.     On or about October 28, 2013, at SLA's recommendation, Tower paid $51.5 million in cash to a SLM affiliate for 50,600 units of UIT Series I-III.

### 4. The Metcom Fraudulent Scheme

85.     By on or about October 28, 2013, SLM was running out of UIT investment units to sell to its Advisory Clients.  In response, Burns, with the substantial assistance of Scherr, created

two additional series of UITs.

86.     At Burn's direction, Scherr found a new asset to securitize the next series of UITs. Scherr, working with his associate at Green Moss, identified a small fiber optic network company located on Long Island, New York (the "Fiber Optic Company"). Scherr created a new company, Metcom Affiliate Holdings, LLC ("Metcom"), for the purpose of acquiring the Fiber Optic Company stock.

87.     Scherr, on behalf of Metcom, negotiated a deal with the Fiber Optic Company in which that company issued what purported to be $100 million worth of stock (purportedly representing 98% of the company's value) and transferred it to Metcom in exchange for $80 million worth of promissory notes, which paid the Fiber Optic Company $800,000 per year in interest. The Fiber Optic Company had never before been valued or sold, but its then-owner considered it to have a maximum value of $10 million, not $100 million. The deal purportedly closed on November 26, 2013.

88.     Scherr, who created the Fiber Optic Company stock certificates and stock transfer agreement on his work computer, and backdated them to November 20, 2013, knew, or was reckless in not knowing, that the stock was greatly overvalued. Sometime in or around November 2013, Scherr asked a former Fiber Optic Company employee to conduct a valuation of the company, but the valuation was not completed until February 2014 – almost three months after the deal closed. Furthermore, the former employee who conducted the valuation had no experience valuing companies and created income forecasts that were not based on actual data. He concluded that the Fiber Optic Company's fire sale value was $125 million. This valuation was a fraudulent, after the fact, justification for the $100 million purchase price that Scherr had concocted months earlier, as Scherr knew or was reckless in not knowing.

89.     On or about November 23, 2013, Metcom sold the Fiber Optic Company shares to

SSF, a wholly-owned SLM entity, in exchange for another set of promissory notes worth $80 million.  SSF, in a document backdated to November 21, 2013, contributed its interest in the Fiber Optic Company to another, newly-formed, SLM subsidiary, TIO Series V, LLC ("TIO V").  November 21, 2013 was the effective date for the creation of two additional series of the UITs, Series IV & V.  SSF contributed equal amounts of TIO V to UITs Series IV & V, in exchange for units of the new series of UITs.  These overvalued shares became the single-largest holding of the newly-created UITs ($50 million of each UIT's $70 million purported value).

90.    Scherr knew, or was reckless in not knowing, that Burns and SLM intended to and did use SLM's overvalued, purported $100 million interest in the Fiber Optic Company to securitize the UIT Series IV & V, and that SLA would cause its Advisory Clients' funds to be used to purchase interests in the UIT Series IV & V.

91.    At Burns's direction, shortly after the creation of the UIT Series IV & V, SLA began recommending that its Advisory Clients use cash or other liquid securities to purchase millions of dollars of units in the two new UITs.  For example:

    a.    On or about December 11, 2013, SLA placed an order on behalf of Tower to purchase 5,000 units of UIT Series IV and 5,000 units of UIT Series V from a SLM affiliate for $10 million.

    b.    On or about December 21, 2013, SLA placed an order on behalf of Tower to purchase 12,500 units of UIT Series IV and 12,500 units of UIT Series V from a SLM affiliate for $25 million.

    c.    On or about January 6, 2014,  SLA transferred 40,000 units of UIT Series IV and 40,000 units of UIT, valued at $80 million, from a SLM subsidiary to Tower, to purportedly satisfy SLM's obligation, under its reinsurance agreements with Tower, to infuse $80 million into the insurance trust fund.

**B. Burns, Through SLA, Instructs Advisory Clients to Make Other Unsuitable Investments in Violation of SLA's Fiduciary Duties to its Advisory Clients**

92.     SLA also breached its fiduciary duties to its Advisory Clients by recommending that they purchase, from SLM and others, various illiquid securities of questionable value that SLM's subsidiaries created, the Southport Securities. The Southport Securities were not suitable investments for SLA's Advisory Clients because they were not eligible assets as defined by each Advisory Client's state insurance regulator.

### 1.   Camelot

93.     At Burns direction, SLM created a new subsidiary of AAS, Camelot Asset Holdings, LLC ("Camelot"). Burns controlled Camelot. Its purported purpose was to invest all of its funds in a non-SLM owned private equity fund, Camelot Acquisitions: Secondary Opportunities, L.P. ("CASO"), located in New York, N.Y.

94.     On or about May 17, 2013, Burns emailed Freestone's CFO and instructed him to invest $8 million of Freestone's funds in Camelot. Also, at Burns's direction, SLA recommended that Companion invest $2 million of its funds in Camelot (collectively with the Freestone investment, the "Camelot Funds"). Burns did not disclose to Freestone or Companion that Camelot was owned by SLM, which meant that the transactions violated their IMAs.

95.     At Burns's direction, Camelot used $9.5 million of the Camelot Funds to purchase an interest in CASO. Burns misappropriated the remaining $500,000, which he sent to an SLM bank account and used to pay SLM's expenses.

96.     By August 6, 2013, Burns had developed serious concerns about CASO's valuation, and the value of Camelot's investment in CASO. Despite these concerns, on or about December 27, 2013, SLA sold Freestone's entire $8 million interest in CASO (held through Camelot) to Tower for $8 million.

97.     As set forth in Section III.D, below, on or about January 6, 2014, Tower told Burns,

SLA and SLM that it did not approve of the Southport Securities and the UIT units that SLA had moved into Tower's two accounts.

98.     On or about January 17, 2014, in response to Tower's objection to its purchase of Camelot, Burns and SLA arranged to resell Tower's $8 million Camelot interest to Freestone, Companion, Imperial, White Rock, Accident, National Automotive, Commonwealth, and Partner Re.  Burns did so despite his documented concerns with CASO.

99.     Burns was correct to have concerns about the CASO investment.  As detailed in a January 30, 2014 civil injunctive enforcement action filed by the Commission against CASO, its investment adviser and others diverted approximately $9.3 million from CASO and sought to mislead the fund's auditors and administrators about their diversion of those funds.  *See S.E.C. v. Penn, et al.*, 14-cv-581-VEC (S.D.N.Y.) Dkt. Nos 1 and 3; see also Dkt. No. 297 (Sept. 14, 2018 Order directing CASO's investment adviser to disgorge $9,286,916.65 in ill-gotten gains and imposing a civil monetary penalty in the same amount).

100.     Despite his concerns about CASO, on or about January 17, 2014, Burns provided a materially misleading memorandum to Imperial's senior management falsely claiming that Camelot was an eligible security for Imperial.

### 2.  FSP

101.     On or about May 31, 2013, at Burns's direction, SLA recommended that Freestone invest $11.5 million and that Companion invest $13.5 million in another newly-formed Southport Security, FSP Capital Holdings, LLC ("FSP"), in exchange for interests in FSP, which they did.

102.     Burns and SLA did not disclose to Freestone or Companion that FSP was a wholly-owned subsidiary of AAS, and therefore that the transactions violated the IMAs.  Burns also did not disclose that SLM used the funds invested into FSP to acquire another insurance company, Imperial, whose assets Burns also raided.  When FSP received the $25 million from Freestone and

Companion, Burns directed that the funds be transferred into another SLM affiliate's bank account, of which $24 million was used to purchase Imperial, and $800,000 was misappropriated and used for SLM's own purposes.

### C.   Burns Uses the Dalmore Bond to Take $35 Million from the Advisory Clients

103.     Sometime prior to November 18, 2013, Burns directed the same broker-dealer associate who had helped fraudulently paper the DNIC deal to create a new entity, Dalmore Financial, LLC ("Dalmore Financial").  On or about November 18, 2013, Burns directed Freestone to invest $15 million and Tower to invest $20 million in a $35 million bond issued by Dalmore Financial (the "Dalmore Bond").

104.     There is no evidence that Burns disclosed to either Freestone or Tower that he had executed a Secured Loan Agreement with Dalmore Financial, under which Dalmore Financial agreed to lend Heartland, an entity directly owned by Burns, the $35 million that Freestone and Tower had invested in the Dalmore Bond notes.

105.     Pursuant to the Secured Loan Agreement between Burns and Dalmore Financial, and at Burns's direction, on or about November 27, 2013, Dalmore transferred $34,825,000 to Heartland.  Burns then used this money in the following ways:

      a.     On or about December 2 and 6, 2013, wired a total of $13.5 million to a SLM-affiliate's brokerage account;

      b.     On or about December 6, 2013, wired $2 million to an account in the name of a broker-dealer in North Carolina for the purpose of acquiring it; and

      c.     On or about December 18 and 31, 2013, transferred a total of $18.95 million to another SLM- affiliate's bank account.

### D.   Tower Demands a Return of its Money

106.     On or about January 3, 2014, Tower asked the Bank Holding Company for the

December 31, 2013 statements for the two Tower accounts managed by SLA, which the Bank Holding Company sent Tower on January 6, 2014.  Tower's management immediately began researching whether the UITs and the other Southport Securities SLA had placed in Tower's accounts (including investments in Camelot, FSP, and the Dalmore Bond); were qualified, eligible investments under New York insurance law.

107.    Tower's CFO and Treasurer called and emailed Burns that same day asking for information to confirm that the securities placed in its accounts were eligible securities under New York law.  On January 10, 2014, a SLM employee emailed Tower to explain that although "we believe the assets are in full compliance" with New York insurance law, SLM would accede to Tower's demand to remove all of the contested assets from Tower's two SLA-managed accounts, and replace them with assets that complied with New York law.

108.    Because of Tower's request that SLA reverse its purchases of the UITs and the Southport Securities, SLA was required to sell even more of these investments to its other Advisory Clients.  Between January 14 and 17, 2014, Burns and SLA coordinated with the Bank Holding Company to sell the following securities from Tower to other SLA Advisory Clients' accounts:

    a.    SLA sold 26,429 units ($26.6 million) of UIT Series I to Freestone, Companion, Imperial, National Automotive, and three other insurance company trust accounts that SLA advised.

    b.    SLA sold 26,429 units ($27.1 million) of UIT Series II to Freestone, Companion, Imperial, National Automotive, and three other insurance company trust accounts that SLA advised.

    c.    SLA sold  23,742 units ($24.4 million) of UIT Series III to Freestone, Companion, Imperial, National Automotive, and three other insurance company trust accounts that SLA advised.

      d.      SLA sold 57,500 units ($57.5 million) of UIT Series IV to Freestone, Companion, Imperial, National Automotive, and three other insurance company trust accounts that SLA advised.

      e.      SLA sold 57,500 units ($57.5 million) of UIT Series V to Freestone, Companion, Imperial, National Automotive, and three other insurance company trust accounts that SLA advised.

      f.      SLA sold 8,000 units ($8 million) of Camelot from Tower to Companion, Freestone, Imperial, National Automotive, and three other insurance company trust accounts SLA advised.

      g.      SLA sold 20 million units ($20 million) of the Dalmore Bond from Tower to Freestone, Companion, and a SLM affiliate.

      h.      SLA sold 11,500 units of FSP ($11.5 million) from Tower to Companion and Freestone.

109.    As a result of these transactions, Tower suffered no significant economic losses from the investments SLA made. The remaining Advisory Clients who purchased these assets, however, were harmed.

**IV.    Burns and Scherr Used the Advisory Clients' Funds to Enrich Themselves, Fund Additional Investments, and For Their Businesses**

110.    From March 2013 to January 2014, SLA and SLM collected over $8 million in investment management and advisory fees from the Advisory Clients.

111.    SLM also obtained millions of dollars of investor funds because it was the issuer and initial seller of the Southport Securities that SLA recommended to the Advisory Clients. As described in paragraph 36, above, Burns sometimes used the money raised from a securities transaction to repay a prior investor – *e.g.*, the October 2013 sale of $51.5 million of UITs to Tower in order to repurchase the Beaconsfield Securities from Freestone. In other instances, such as with

27

the Dalmore Bond, Burns used the proceeds of securities transactions to make payroll, transfer large sums of money to himself and Scherr, and to acquire new investment opportunities to continue to grow SLM's business.

112.    Burns and Scherr personally profited from these schemes.  During the Relevant Period, Burns moved approximately $35 million of Advisory Clients' funds through his personal bank accounts, of which he retained approximately $915,000, more than half of which was salary he paid himself.  He transferred the remainder to his company, SLM.  From May 2013 to 2016, Scherr obtained approximately $1.4 million (most of which was salary) derived from Advisory Clients' funds.

**V.        Burns Makes Misrepresentations As He Attempts to Keep SLM Afloat**

113.    In January 2014, after the reversal of the Tower transactions, both SLM and its Advisory Clients were strapped for cash.  In order to raise more cash, Burns made numerous material misrepresentations to the Advisory Clients in a last ditch attempt to get more money from SLA's clients.

114.    For example, in a January 2014 meeting in Manhattan, New York, Burns presented the CEO of Imperial a "Portfolio Overview" in which Burns described several new investments in Southport Securities, which Burns recommended that Imperial make.  Burns omitted from these descriptions any reference to the fact that SLM was the issuer and sometimes seller of each of the Southport Securities Burns wanted Imperial to acquire.  Burns also misleadingly claimed that each investment was an eligible investment under Louisiana law.

115.    On January 17, 2014, Imperial's CEO sent a memo to Burns and SLA, reminding Burns that by January 22, 2014, Burns was to provide Imperial with a memorandum demonstrating the admissibility of the Southport Securities pursuant to Louisiana law and Imperial's investment guidelines.

116.     Also on or about January 17, 2014, without Imperial's specific authorization, Burns directed SLA to invest $21.2 million of Imperial's funds in each of the five UIT series and to invest $2.5 million in Camelot.  SLM used Imperial's money to repay Tower, and Imperial never recouped these funds.

117.     On January 22, 2014, Burns followed-up Imperial's CEO's request for more information about whether the Southport Securities were eligible under Louisiana law and Imperial's investment guidelines.  Specifically, Burns emailed Imperial's CEO a series of more detailed memoranda describing the Southport Securities that SLA had already recommended to Imperial.  Burns made a number of material misrepresentations in these memoranda, including several material misstatements about the UITs.  For example, Burns described the UITs' underlying investments as being "2/3 Treasuries and 1/3 Asset Backed Securities."  Burns knew or was reckless in not knowing that this statement was false, as the UITs only invested approximately 6% of their funds into United States treasury securities.

118.     In a further attempt to keep SLM afloat, on January 31, 2014, Burns directed the account manager at the Bank Holding Company to sell Tower two promissory notes in the amount of $77 million and $5.4 million respectively.  These instructions concerned the account manager, who emailed Tower to ask if he should complete the transaction.  Tower promptly replied that he should not, and the account manager followed Tower's instructions.

119.     Recognizing that his scheme was about to collapse, Burns began taking steps to remove himself from SLM and SLA.  On January 31, 2014, Burns signed an affidavit admitting, among other facts, that he was the "Ultimate Control Person" for Freestone, Imperial, National Automotive, Redwood, and SPRC.  He also stated that SPRC had a portfolio of assets that he claimed to consist of "approximately $238,641,627 in several mutual funds and other private investments" for which, he admitted, "there was no active bid from any third party" and which he

described as the "Illiquid portfolio." He further stated that, on January 6, 2014, SPRC had agreed to

materially change the composition of the "Illiquid portfolio" at the request of Tower and another

company, and that, on January 10, 2014, he had instructed SLA to purchase the Illiquid portfolio for

the accounts of Freestone, Imperial, National Automotive, Redwood and SPRC, and several other

insurance affiliates for which SLA had discretionary investment authorization.

120.    Burns further admitted that he "solely conducted the analysis regarding the

regulatory admissibility and suitability of the Illiquid portfolio and directed the allocation of

securities to individual portfolios." He also admitted that he had not consulted with the Board of

Directors or the Investment Committees of any of the subject insurance companies prior to the

transactions (albeit adding that he had concluded that all of the investments were permitted pursuant

to the relevant statutory authorities and/or the relevant provisions of the relevant trust agreements).

121.    Shortly thereafter, on or around February 16, 2014, Burns divested himself of his

interests in SLM and its subsidiaries and Scherr gained control of those entities.

VI.    Fallout of the Scheme

122.    After Scherr obtained control of SLM, he did not initially alert the Advisory Clients

of the change in control of SLM, or the issues Tower had raised regarding the eligibility of the UITs

and the other Southport Securities.

123.    Nevertheless, starting in February 2014, SLA's other Advisory Clients gradually

realized that Burns was no longer running SLM and SLA, and that their investment portfolios

contained millions of dollars' worth of potentially ineligible assets. Because SLM did not have the

funds to repurchase any additional UITs or Southport Securities from the Advisory Clients, it was

unable to return funds to its remaining Advisory Clients when asked.

124.    In February 2014, several Advisory Clients formally revoked SLA's trading

authority over their funds, and began efforts to recoup some of their investments.

125.    Because of the fraudulent conduct charged herein, Freestone entered into receivership in Delaware and is currently in liquidation.

126.    Because of the fraudulent conduct charged herein, in September 2014, SLM placed Redwood into voluntary liquidation.

127.    Because of the fraudulent conduct charged herein, in August 2014, Companion's parent company wrote off more than $100 million of Companion's losses brought about by Burns and Scherr and the entities they controlled and sold Companion to another insurance company.

128.    Because of the fraudulent conduct charged herein, Imperial and National Automotive entered into receivership after the events described herein and were subsequently sold.

129.    And because of the fraudulent conduct charged herein, SLM sold off SPRC at a large loss.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Burns)**

130.    The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 129.

131.    Burns, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

a.      knowingly or recklessly employed  devices, schemes, or artifices to defraud;

b.      knowingly, recklessly or negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.      knowingly, recklessly or negligently engaged in transactions, practices, or

courses of business which operated or would have operated as a fraud or

deceit upon purchasers of securities.

132.     By engaging in such conduct, Burns violated, and unless restrained and enjoined

will in the future violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## SECOND CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act**
**(Burns)**

133.     The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 129.

134.     As alleged more fully above, SLM violated Section 17(a)(2) of the Securities Act

[15 U.S.C. § 77q(a)(2)].

135.     By engaging in the conduct described above and pursuant to Section 15(b) of the

Securities Act [15 U.S.C. § 77o(b)], Burns, singly or in concert, directly or indirectly, aided and

abetted, and is therefore also liable for SLM's primary violations of Section 17(a)(2) of the

Securities Act, because Burns knowingly or recklessly provided substantial assistance to SLM's

violations of Section 17(a)(2) of the Securities Act.

136.     By engaging in the conduct described above, Burns aided and abetted, and unless

restrained and enjoined will in the future aid and abet, violations of Section 17(a)(2) of the

Securities Act.

## THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(Burns)**

137.     The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 129.

138.     Burns, by engaging in the conduct described above, directly or indirectly, in

connection with the purchase or sale of securities, by the use of means or instrumentalities of

interstate commerce, or of the mails, or of any facility of any national securities exchange,

knowingly or recklessly:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material facts or omitted to state material facts

        necessary in order to make the statements made, in light of the

        circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would

        have operated as a fraud or deceit upon any person.

139. By engaging in the foregoing conduct, Burns violated, and unless restrained and

enjoined will in the future violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

s10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5(b) thereunder**
**(Burns)**

140. The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 129.

141. As alleged more fully above, SLM violated Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

142. By engaging in the conduct described above and pursuant to Section 20(e) of the

Exchange Act [15 U.S.C. § 78t(e)], Burns, singly or in concert, directly or indirectly, aided and

abetted, and is therefore also liable for, SLM's primary violations of Section 10(b) of the Exchange

Act and Rule 10b-5(b) thereunder, because Burns knowingly or recklessly provided substantial

assistance to SLM's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

143. By engaging in the conduct described above, Burns aided and abetted, and unless

restrained and enjoined will in the future aid and abet, violations of Section 10(b) of the Exchange

Act and Rule 10b-5(b) thereunder.

### FIFTH CLAIM FOR RELIEF
#### Violations of Sections 206(1), (2) and (3) of the Advisers Act
#### (Burns)

144.     The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 129.

145.     Burns, while acting as an investment adviser, singly or in concert, by the use of the

mails and any means or instrumentality of interstate commerce, directly or indirectly:

        a.     knowingly or recklessly employed devices, schemes, or artifices to defraud

            clients or prospective clients;

        b.     knowingly, recklessly or negligently engaged in transactions, practices, or

            courses of business which operated as a fraud or deceit upon clients or

            prospective clients; or

        c.     knowingly, recklessly or negligently, while acting as principal for his own

            account, sold securities to or purchased securities from clients without

            disclosing to such clients in writing before the completion of such

            transactions the capacity in which he was acting and obtaining the consent

            of the clients to such transactions.

146.     By engaging in the conduct described above, Burns violated, and unless restrained

and enjoined will in the future violate, Sections 206(1), (2) and (3) of the Advisers Act [15 U.S.C. §

80b-6(1), (2) and (3)].

### SIXTH CLAIM FOR RELIEF
#### Aiding and Abetting Violations of
#### Sections 206(1), (2) and (3) of the Advisers Act
#### (Burns)

147.     The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 129.

148.     As alleged more fully above, SLA, acting as an investment adviser, violated

Sections 206(1), (2) and (3) of the Advisers Act [15 U.S.C. § 80b-6(1), (2) and (3)].

149.     By engaging in the conduct described above, and pursuant to Section 209(f) of the

Adviser Act [15 U.S.C. § 80b-9(f)], Burns, singly or in concert, directly or indirectly, knowingly or

recklessly aided, abetted, counseled, commanded, induced, or procured SLA's violations of Sections

206(1), (2) and (3) of the Advisers Act [15 U.S.C. §§ 80b-6(1),(2) and (3)].

150.     By engaging in the conduct described above, Burns aided and abetted, and unless

restrained and enjoined will in the future aid and abet, violations of Sections 206(1), (2) and (3) of

the Advisers Act.

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of**
**Sections 206(1) and (2) of the Advisers Act**
**(Scherr)**

151.     The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 129.

152.     As alleged more fully above, Burns and SLA, acting as investment advisers,

violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

153.     By engaging in the conduct described above, and pursuant to Section 209(f) of the

Adviser Act [15 U.S.C. § 80b-9(f)], Scherr, singly or in concert, directly or indirectly, knowingly or

recklessly aided, abetted, counseled, commanded, induced, or procured Burns's or SLA's violations

of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

154.     By engaging in the conduct described above, Scherr aided and abetted, and unless

restrained and enjoined will in the future aid and abet, violations of Sections 206(1) and (2) of the

Advisers Act.

35

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

A.      Permanently enjoin Burns, and each of his agents, servants, employees, and attorneys, and any other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of: (a) Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (b) Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; and (c) Sections 206(1), 206(2), and 206(3) of the Advisers Act [15 U.S.C. § 80b-6(1)-(3)].

B.      Permanently enjoin Scherr, and each of his agents, servants, employees, and attorneys, and any other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

C.      Order that Burns and Scherr disgorge all ill-gotten gains obtained as a result of the violations alleged in this Complaint, with prejudgment interest.

D.      Order that Burns pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be determined by the Court;

E.      Order that Scherr pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be determined by the Court; and

F.      Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:          New York, New York
                October 16, 2018

                                    Respectfully submitted,

                                    Marc P. Berger, Esq.
                                    Lara Shalov Mehraban, Esq.
                                    Thomas P. Smith, Jr., Esq.
                                    Kevin P. McGrath, Esq.
                                    John Lehmann, Esq.
                                    Nathaniel I. Kolodny, Esq.
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    200 Vesey Street, Suite 400
                                    New York, New York 10281-1022
                                    (212) 336-0533 (McGrath)
                                    E-mail: McGrathK@sec.gov